978 P.2d 684

**In the Interest of John DOE (born on November 23, 1978).**

No. 17795.

Supreme Court of Hawai'i.

Feb. 2, 1999.

Alexa D.M. Fujise, Deputy Prosecuting Attorney, (Albert Cook, Law Clerk, with her on the brief), on the brief, for petitioner-appellee.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

Opinion of the Court by KLEIN, J.

We granted petitioner-appellant State of Hawaii's (the prosecution) petition for a writ of certiorari to review the decision of the Intermediate Court of Appeals (ICA) in *In re John Doe,* —— Hawai'i ——, —— P.2d —— (App.1998) [hereinafter the "ICA's opinion"]. In *Doe*, minor John Doe (Doe) appealed the family court's January 11, 1993 order denying his motion for reconsideration of orders denying his motions to suppress and to dismiss for violation of a speedy trial and adjudging him a law violator for the unauthorized control of a propelled vehicle (UCPV), in violation of Hawai'i Revised Statutes (HRS) § 708–836 (1985).[1] The ICA affirmed the family court's denial of Doe's motion to dismiss on speedy trial grounds, but reversed

---

1. The ICA cites HRS § 708–836 (1993) as the controlling statute but the 1985 statute was in effect at the time of Doe's arrest. The statutes, however, are identical and state in relevant part:

    **Unauthorized control of propelled vehicle.** (1) A person commits the offense of unauthorized control of a propelled vehicle if he intentionally exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent or by changing the identity of the vehicle without the owner's consent.

    (2) "Propelled vehicle" means an automobile, airplane, motorcycle, motorboat, or other motor-propelled vehicle.

the denial of Doe's motion to suppress on the basis that the police failed to notify Doe's mother pursuant to HRS § 571–31 (Supp. 1992).[2] In particular, the ICA held:

> [A]s a matter of statutory interpretation, ... when a police officer takes a child into custody pursuant to HRS § 571–31(a), the child's parents, guardian, or legal custodian shall be notified immediately pursuant to HRS § 571–31(b), *and the child shall not be subjected to custodial interrogation until the child's parents, guardian, or legal custodian is/are notified of the plans for, and has/have been allowed a reasonable opportunity to communicate with the child prior to and to be present at, the custodial interrogation of the child.*

ICA's opinion at ——, —— P.2d at —— (emphasis added). The ICA also stated that,

> "[i]f the parents, guardian, or legal custodian decline to, or fail to, respond to that reasonable opportunity, the custodial interrogation may proceed without him/her/them subject to the requirements of *Fare v. Michael C.*, 442 U.S. 707, 734–35 [99 S.Ct. 2560, 61 L.Ed.2d 197] (1979), and *State v. Green*, 51 Haw. 260, 457 P.2d 505 (1969), and other relevant precedent."

*Id.* at ——, —— P.2d at ——.

For the reasons set forth below, we hold that the plain language of HRS § 571–31(b) requires neither an opportunity for parent-child communication prior to police interrogation nor parental presence during the custodial questioning of a minor. Accordingly, because we hold that Doe's statement to the police was voluntarily and freely given, we disagree with and overrule that portion of the ICA's opinion regarding parental notification under HRS § 571–31(b). In all other respects, we affirm and reinstate the family court's adjudication and sentence of Doe as a law violator.

## I. *BACKGROUND*

On July 26, 1992, University of Hawai'i Campus Security Officer Peter Spallone observed two minors on a white moped following a red moped through campus. Doe was a passenger on the white moped. According to Spallone, he stopped the minors riding the white and red mopeds because: (1) minors are not allowed on mopeds; (2) two persons are not permitted to ride on one moped on campus; and (3) the red moped matched the description of a moped reported stolen hours earlier. After stopping the boys, Spallone noticed the mopeds were "hot-wired." The police were notified, and Doe was taken into custody at approximately 6:00 p.m.

Two hours later, the police notified Doe's mother at her work place. She arrived at the station at about 10:10 p.m. Thereafter, at 10:33 p.m., Detective Mark Weise interviewed Doe with respect to his arrest for UCPV. Detective Weise informed Doe of his constitutional rights using the Honolulu Police Department's (HPD) Juvenile Rights Form. In particular, Detective Weise advised Doe that he had a right to have counsel or anyone else, such as his mother or father, present with him during questioning. Doe declined to have a guardian, parent, or an attorney with him during questioning. In addition, Doe signed the HPD form and initialed each sentence, signifying that he understood his rights. Following the interview, Doe was released to the custody of his mother.

---

**2.** The ICA cites HRS § 571–31(a) & (b) (1993) as the controlling statute but the 1992 supplement was the statute in effect at the time of Doe's arrest. The statutes, however, are identical and state in relevant part:

> **Taking children into custody; release; notice.** (a) A child may be taken into custody by any police officer without order of the judge when there are reasonable grounds to believe that a child comes within section 571–11(1) or (2), or by any police or probation officer when there are reasonable grounds to believe that the child has violated a court order of probation or protective supervision.

> (b) When an officer or other person takes a child into custody the parents, guardian, or legal custodian shall be notified immediately. The child shall be (1) released to the care of the child's parent or other responsible adult; (2) referred or delivered by the court or other designated agency with or without simultaneous release to parent or other responsible adult; or (3) taken directly to a detention facility, if the child's immediate welfare or the protection of the community requires it, or the child is subject to detention for violation of a court order of probation or protective supervision.

On December 18, 1992, two petitions were filed against Doe alleging that he committed two offenses of UCPV. At the adjudication hearing on May 27, 1993, the prosecutor announced that he was unable to proceed because his "complaining witness [was] not present." The petitions were dismissed without prejudice.

On July 8, 1993, the prosecution refiled the two petitions against Doe. Doe did not appear at the adjudication hearing on August 13, 1993, and the court issued a summons for his appearance. On November 8 and 18, respectively, Doe, by and through counsel, filed motions to suppress his statements and to dismiss his case for violation of his constitutional right to a speedy trial.

At the pretrial hearing on the motions, the family court denied Doe's motion to dismiss, ruling as follows:

> Looking at the charge and the missing witness reason for delay, balancing that against the only prejudice or only factor argued on behalf of the minor which was that his memory is not as good, the Court is going to come out on the side of the government insofar as this Motion is concerned and deny that Motion.

As to Doe's motion to suppress, Doe argued that the police violated HRS § 571–31(b) when his mother was not "notified immediately" and that a "violation of the detention procedure would demand a suppression of the tainted confession." Doe also complained that his statement to the police was involuntary because "he was subjected to intimidating and inhumane" treatment while in custody.

Detective Weise testified that there were no pressure, threats, or coercion involved in taking Doe's statement. Nor did he make any promise in exchange for Doe's statement. Rather, Doe indicated orally and in writing that he understood his rights as they were read to him.

Next, Doe's mother testified that after she arrived at the police station she waited about half an hour before her son was released. She observed that upon being released her son looked "just like normal." Doe's mother acknowledged Doe saying he was a "little bit" hungry, but did not complain about being thirsty.

Finally, Doe admitted that (1) Detective Weise fully informed him of his constitutional rights prior to questioning, (2) he signed the HPD form signifying that he understood his rights, (3) he declined to have an attorney or his parents present during police interrogation, (4) Detective Weise did not make any promises in exchange for his testimony, and (5) he never told Detective Weise to stop the interview. Doe also testified that the police did not offer him anything to eat or drink while in custody and that he felt "nervous" and a "little bit" frightened.

Based on the testimonies and evidence presented, the family court denied Doe's motion to suppress, ruling that the police did not violate HRS § 571–31 by releasing Doe thirty minutes to one hour after his mother arrived at the station. The court also concluded that Doe's statement was freely and voluntarily given and not the product of coercive police tactics.

Testimony relating to the hearing of the pretrial motions was consolidated with trial, and the prosecution presented additional testimony from Spallone and Detective Weise. Detective Weise testified that Doe initially told him that his friends found the mopeds. However, after repeatedly being questioned about the condition of the mopeds, Doe admitted that the mopeds were "hot wired" and believed them to be stolen.

The defense did not call any witnesses or present any evidence.

Following the close of evidence and final arguments of counsel, the family court adjudged Doe a law violator for one count of UCPV[3] and sentenced him to perform fifty hours of community service work within ninety days.

On December 21, 1993, Doe filed a motion for reconsideration of the family court's denial of his motions to dismiss and to suppress and adjudicating him to be a law violator. On January 11, 1994, after a hearing, the family court denied Doe's motion for recon-

---

3. The family court dismissed the other petition with prejudice.

sideration on the grounds that there was "sufficient evidence to convict the minor beyond a reasonable doubt."

The family court's findings of fact and conclusions of law denying Doe's motions to suppress and to dismiss and its adjudication of Doe as a law violator were filed on February 28, 1994. Doe timely filed his appeal challenging the family court's January 11, 1994 order denying his motion for reconsideration because: (1) he was denied a speedy trial; (2) the police violated the detention procedures in HRS § 571–31(b) by holding him in custody for more than four hours; and (3) his statements to the police were the product of "intimidating and inhumane" police tactics.

## II. *THE ICA'S DECISION*

After affirming the family court's denial of Doe's motion to dismiss on speedy·trial grounds, the ICA addressed the family court's denial of Doe's motion to suppress his statement to the police. Doe essentially argued that his statement to police should have been suppressed because: (1) by holding Doe in custody for over four hours before releasing him to his mother, the police violated HRS § 571–31(b); and (2) "he had his will subjugated by the police techniques" of depriving him of food and water while in custody.

Upon review of the record, the ICA held that "the lapse of time between [Doe] being taken into custody and the notification of his mother [was] not [so] presumptively unreasonable" as to violate HRS § 571–31(b)'s notification requirement. *Id.* at ——, —— P.2d at ——. The ICA also held that "[Doe] was released to the custody of his mother within a reasonable time." *Id.* at ——, —— P.2d at ——. Despite these holdings, the ICA construed the words "notified immediately" to include the concept that a minor may not be "subjected to custodial interrogation until the child's parents, guardian or legal custodian is/are notified of the plans for, and has/have been allowed a reasonable opportunity to communicate with the child prior to and to be present at, the custodial interrogation of the child." *Id.* at ——, —— P.2d at ——. The ICA then concluded that the police violated

HRS § 571–31(b) because "the police did not inform Doe that his mother had arrived" and Doe's mother was not given the opportunity to speak with her son or to be present during the police interrogation. Consequently, the ICA reversed the family court's denial of Doe's motion to suppress and remanded the case for further proceedings. *Id.* at ——, —— P.2d at ——. In light of this disposition, the ICA declined to address Doe's second point of error, which challenged the family court's denial of his motion to suppress on the basis of coercive police tactics.

On May 29, 1998, the prosecution applied for a writ of certiorari seeking review of the ICA's opinion, which we granted on June 4, 1998.

## III. *STANDARDS OF REVIEW*

### A. *Statutory Construction*

We interpret statutes *de novo.* *Shimabuku v. Montgomery Elevator Co.,* 79 Hawai'i 352, 357, 903 P.2d 48, 51 (1995). When construing a statute, the starting point is the language of the statute itself. *Richardson v. City & County of Honolulu,* 76 Hawai'i 46, 63, 868 P.2d 1193 (1994); *see also Mathewson v. Aloha Airlines, Inc.,* 82 Hawai'i 57, 71, 919 P.2d 969, 983 (1996) (citation and internal quotation marks omitted). "[C]ourts are bound to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *State v. Kaakimaka,* 84 Hawai'i 280, 289–90, 933 P.2d 617, 626–27, (quoting *State v. Ortiz,* 74 Haw. 343, 351–52, 845 P.2d 547, *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993), *reconsideration denied,* 84 Hawai'i 496, 936 P.2d 191 (1997)). Words are given their common meaning unless some wording in the statute "requires a different interpretation." *Saranillio v. Silva,* 78 Hawai'i 1, 10, 889 P.2d 685, 694 (1995) (citing *Ross v. Stouffer Hotel Co., (Hawai'i) Ltd.,* 76 Hawai'i 454, 461, 879 P.2d 1037, 1044–45 (1994)).

Moreover,

[a]lthough the intention of the legislature is to obtained primarily from the

language of the statute itself, we have rejected an approach to statutory construction which limits us to the words of a statute, for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. Thus, the plain language rule of statutory construction ... does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Sato v. Tawata,* 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995) (citations, brackets, internal quotation marks, and ellipses points omitted).

Finally, "[a] rational, sensible and practicable interpretation [of a statute] is preferred to one which is unreasonable or impracticable," *State v. Lobendahn,* 71 Haw. 111, 112, 784 P.2d 872, 873 (1989) (citations and internal quotation marks omitted) (brackets in original), because "[t]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality." *State v. Arceo,* 84 Hawai'i 1, 19, 928 P.2d 843, 861 (1996) (quoting *State v. Malufau,* 80 Hawai'i 126, 137, 906 P.2d 612, 623 (1995) (citation and internal quotation marks omitted)).

*Keliipuleole v. Wilson,* 85 Hawai'i 217, 221–22, 941 P.2d 300, 304–05 (1997).

### B. Voluntariness of a Statement to the Police

■ "[W]e apply a *de novo* standard of appellate review to the ultimate issue of the voluntariness of a confession." *State v. Hoey,* 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994) (internal quotation and brackets omitted). We thus "examine the *entire record* and make an *independent determination* of the ultimate issue of voluntariness based upon that review and the *totality of the circumstances* surrounding [the defendant's] statement." *Id.* (quoting *State v. Kelekolio,* 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (citations and internal quotation marks omitted) (brackets in original and emphasis added)).

### IV. DISCUSSION

### A. HRS § 571–31(b) Does Not Require the Police to Either Give Parents an Opportunity to Speak With Their Child Prior to Police Interrogation Or to Offer Parents the Option to Be Present During Custodial Questioning of Their Child.

■ In its application for a writ of certiorari to this court, the prosecution argues, *inter alia,*[4] that the ICA erred in interpreting HRS § 571–31(b) "to include not only notifying the parent that his/her child is in custody, but also notifying the child when his parent arrives, giving the parent an opportunity to meet and speak with the child, and giving the parent the option to be present when the child is questioned[.]" The prosecution contends that validating the ICA's interpretation of HRS § 571–31 would "undermine confidence" in the statute's plain language and "frustrate the notice purpose of ... [the] statute." We agree.

The ICA begins its interpretation of HRS § 571–31(b) not with the statute's plain language, but by leapfrogging into an examination of the purposes behind HRS § 571–31. In the ICA's view, HRS § 571–31(b) is derived from Article IV, § 16 of the 1959 Standard Family Court Act, which includes the following commentary:

"Whenever possible and especially in the case of young children, *no child should be*

---

4. The prosecution also argues that "[t]he ICA exceeded its authority in raising the issue of parental presence as neither party raised it, [nor] was [it] ... plain error." Our disposition obviates the necessity of discussing this point.

*interviewed except in the presence of his parents or guardian.* This should always be the policy when a child is being questioned about his participation or when a formal statement concerning the child's participation in the alleged delinquent act is being taken. The presence of a parent during the interview may be helpful to the police as the parental attitude shown under such circumstances may help the police decide whether the case should be referred to court or to another agency. This procedure, of course, would not apply when the matter being investigated involves the child's parents. In cases, where the child has freely admitted his participation to the act to the police, there appears to be nothing improper about interviewing the child to secure background information of a social nature without the parents being present. It may be equally necessary to interview the parents without the child being present to secure social information for the purpose of making a referral." (*Standards for Specialized Courts Dealing with Children*, U.S. Children's Bureau Publication No. 346, 1954).

ICA's opinion at ——, —— P.2d at —— (emphasis added). Consequently, the ICA adopted the Act's commentary as "one of the logical purposes of HRS § 571–31(b)" and construed the word "notified" to require that

the child shall not be subjected to custodial interrogation until the child's parents, guardian, or legal custodian is/are notified of the plans for, and has/have been allowed a reasonable opportunity to communicate with the child prior to and to be present at, the custodial interrogation of the child.

ICA's opinion at ——, —— P.2d at ——.

When interpreting statutes such as HRS § 571–31, however, this court has long held that "[t]he fundamental starting point is the language of the statute itself." *Peterson v. Hawai'i Elec. Light Co., Inc.*, 85 Hawai'i 322, 327, 944 P.2d 1265, 1270 (1997) (quoting *Mathewson*, 82 Hawai'i at 71, 919 P.2d at 983 (citation and internal quotation signals omitted)). The plain and unambiguous language of HRS § 571–31(b), *see supra* note 2, states that a parent, guardian, or legal custodian must be "notified immediately" when a child

has been taken into custody. Although the word "notified" is not defined in Chapter 571, the term's common meaning is "to inform by words or writing" or "to make known." *Black's Law Dictionary* 1063 (6th ed.1990). Nothing in the statute leads us to believe that "notified" should be given a different meaning other than requiring the police to contact a minor's parent, guardian, or legal custodian, with the information that their child is in police custody.

Moreover, the structural scheme and legislative history of HRS § 571–31 clearly indicates that the statute provides "criteria for the release, custody, and detention of a minor by a police officer, intake officer, and other person." 1980 Haw. Sess. L. Act 303 § 4 at 939. HRS § 571–31 makes no reference to procedural notification requirements prior to the custodial interrogation of minor. Subsequent amendments of HRS § 571–31 also reveal that changes were made "as to the circumstances under which a police officer may *detain* a child[,]" not interrogate a child. Sen. Conf. Comm. Rep. No. 473, in 1976 Senate Journal, at 1087. This being the case, the statute's structural scheme and legislative history do not support the ICA's extension of the term "notified" to include conditions under which custodial interrogation of minors can be conducted.

We realize that the individual statutes included in HRS Chapter 571 were "fashioned" after the 1959 Standard Family Court Act and that the legislature "incorporated more specifically such portions of the Standard Family Court Act as have been provided or recommended by the State Commission on Children and Youth." Stand. Com. Rep. No. 272, in 1965 Senate Journal at 550. There is no indication, however, that the legislature considered, adopted, or incorporated article IV, § 16 of the 1959 Standard Family Court Act or its commentary into HRS § 571–31.

Assuming *arguendo* that HRS § 571–31 is based on article IV, § 16 of the 1959 Standard Family Court Act, the language of the commentary is advisory, not mandatory. Indeed, the ICA recognized in its own discussion that "[i]f the legislature intended to mandate 'the presence of parents or guard-

ian' during custodial interrogations of minors by police, it could have expressly so stated in the statute." ICA's opinion at ——, —— P.2d at ——. Because the legislature failed to do so, we hold, as a matter of law, that the notification requirement in HRS § 571–31(b) provides only for parental notification that the police have detained the minor.

■ Finally,

> where there is no ambiguity in the language of the statute, *and the literal application of the language would not produce an absurd or unjust result* clearly inconsistent with the purposes and policies of the statute, there is no room for judicial construction and interpretation, and the statute must be given effect according to its plain and obvious meaning.

*Sandy Beach Defense Fund v. City Council,* 70 Haw. 361, 369, 773 P.2d 250, 256 (1989) (quoting *State v. Palama,* 62 Haw. 159, 161, 612 P.2d 1168, 1170 (1980)) (internal quotation marks omitted and emphasis in original). In this instance, no inconsistency exists between the literal application and the purposes and policies of the statute. If we, like the ICA, were to rely on the commentary to the 1959 Standard Family Court Act to convey the "purpose" of HRS § 571–31, we would be conferring upon the statute a meaning not found within its obvious language and structural scheme. While the ICA's well-intentioned interpretation may be laudable, absent legislation incorporating the requirements set forth in the commentary to the 1959 Standard Family Court Act, we cannot, by judicial fiat, prescribe such a requirement.

Accordingly, we hold that the ICA erred in its interpretation of HRS § 571–31(b) by creating a statutory right in favor of a minor's parent, guardian, or legal custodian to communicate with the minor prior to and to be present at the minor's custodial interrogation. Pursuant to the unambiguous language of the statute, we hold that HRS § 571–31(b) requires only what it plainly states: that the police must contact a minor's parent, guardian, or legal custodian to notify them that their child is in police custody.

B. *The Circuit Court Properly Admitted Minor's Voluntary Statement to the Police.*

In light of the above holding, we address Doe's claim that he "had his will subjugated" by "intimidating and inhumane" police tactics.

First, Doe appears to claim that he did not knowingly, intelligently, and voluntarily waive his right to have counsel or his parents present with him during the questioning.

■ Our courts have recognized that "[m]inors, like adults, may waive their constitutional right to remain silent [or have an attorney present during questioning], provided the waiver is made voluntarily, knowingly, and intelligently." ICA's opinion at ——, —— P.2d at —— (citing *State v. Green,* 51 Haw. 260, 263, 457 P.2d 505, 507 (1969)). We have also stated that "the waiver of a minor's right to counsel [and against self-incrimination] should be reviewed with great care .... based upon the totality of the circumstances" surrounding the interrogation. *In re Doe,* 77 Hawai'i 46, 50, 881 P.2d 533, 537 (1994). In this connection, "whether a defendant does actually understand the existence of these rights and affirmatively undertakes not to avail himself of the utility of these rights depends upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Green,* 51 Haw. at 265, 457 P.2d at 508. *See also Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (stating that inquiry into all the circumstances surrounding a juvenile's interrogation includes "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to under the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights").

The United States Supreme Court, in *Fare,* further explained that

> [t]here is no reason to assume that such courts—especially juvenile court, with their special expertise in this area—will be unable to apply the totality-of-the-circumstances analysis so as to take into account

those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved. Where the age and experience of a juvenile indicate that his request for ... his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination. At the same time, that approach refrains from imposing rigid restraints on police and courts in dealing with an experienced older juvenile with an extensive prior record who knowingly and intelligently waives his Fifth Amendment rights and voluntarily consents to interrogation.

*Id.* at 725–26, 99 S.Ct. 2560.

In the case before us, the record clearly indicates that Detective Weise advised Doe of his *Miranda* rights prior to questioning. Specifically, Detective Weise informed Doe that he had a right to have counsel or anyone else, such as his mother or father, present with him during questioning. Doe declined to have an attorney or parent present with him during the interview. Consequently, he signed and initialed the HPD form signifying that he understood his rights, as they were explained to him. Given these circumstances, Doe clearly waived his right to have counsel or his parents present with him during the police interrogation.

Next, Doe asserts that his statement to Detective Weise was nevertheless involuntary because he was deprived of food and water while in custody and held "in a room with a physically huge detective."

In *Kelekolio*, 74 Haw. at 503, 849 P.2d at 69, we recognized that "[a] defendant's mental and physical condition can be part of the 'totality of circumstances' relevant to the issue of his or her custodial statements." In that case, the defendant claimed that his statements to the police were coerced because he was deprived of sleep and food while in police custody for over twenty hours. *Id.* at 488, 849 P.2d at 63. We held that the defendant's lack of sleep and food did not render his statements involuntary because they were "self-imposed" and "not the product of any impermissible scheme on the part of the police to lower his resistance or render him susceptible to improper suggestion[.]" *Id.* at 504, 849 P.2d at 70.

Like the defendant in *Kelekolio*, Doe urges this court to suppress his statement to the police because he was deprived of food and water for four hours and subjected to "intimidating and inhumane" police tactics. Doe's contention is meritless.

The record reveals that Doe did not complain of being hungry or thirsty during his interview with Detective Weise. Additionally, Doe's mother stated that Doe did not tell her that he was thirsty, but only that he was a "little bit" hungry. Moreover, Doe did not testify that he was intimidated or threatened by Detective Weise's physical stature. In fact, Doe's mother testified that, when she picked him up at the station, he did not appear frightened, but rather "look[ed] just like normal." Thus, having examined the entire record and considered the totality of the circumstances surrounding Doe's statement, we hold that Doe knowingly, intelligently, and voluntarily gave his statement to Detective Weise and that the circuit court properly denied Doe's motion to suppress.

## V. CONCLUSION

For the foregoing reasons, we disagree with and overrule that portion of the ICA's opinion interpreting HRS § 571–31(b). In all other respects, we affirm. In addition, because Doe's statement to the police was knowingly, intelligently, and voluntarily given, we reinstate the family court's adjudication and sentence of Doe as a law violator.