988 P.2d 200

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Darrell GELLA, Defendant–Appellee.**

**No. 22428.**

Supreme Court of Hawai'i.

Nov. 16, 1999.

---

136

Alexa D.M. Fujise, Deputy Prosecuting Attorney, on the briefs, for the plaintiff-appellant State of Hawai'i.

Linda C.R. Jameson, Deputy Public Defender, on the briefs, for the defendant-appellee Darrell Gella.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

The plaintiff-appellant State of Hawai'i (the prosecution) appeals from the findings and order granting the defendant-appellee Darrell Gella's motion to suppress statements, filed by the first circuit court on March 19, 1999. The prosecution alleges one point of error on appeal, namely, that the circuit court erred in granting Gella's motion to suppress. Because we agree with the prosecution, we vacate the circuit court's order granting Gella's motion and remand for further proceedings.

## I. BACKGROUND

On December 22, 1998, at approximately 4:45 p.m., Gella attempted to break into two cars on Kāheka Street, in the City and County of Honolulu. Gella had been smoking

"ice," had not slept in four days, and had a handgun in his possession.

Unsuccessful in his break in attempt, Gella rode away on his bicycle. Gella felt another bicycle strike him from behind, turned around, and observed that the rider of the other bicycle was a police officer who was "trying to grab [him]." Gella dismounted his bicycle, ran around the corner, jumped over a wall, entered a building, and changed his clothes in a doctor's office. Gella left the doctor's office, but noticed police in the hallway, so went to use the bathroom. When Gella emerged from the bathroom, he again observed police officers in the hallway. He attempted to flee, the police officers chasing him out of the building. After a foot chase, the police officers tackled Gella on the pavement, subdued him, and recovered the firearm.

Gella testified that, although the police had handcuffed him and he had ceased resisting, he was struck both in the eye and in the back of the head, and his face was pushed into the sidewalk. It is uncontested that, following his arrest, Gella was taken to a hospital, where he received six stitches on his forehead.

Shortly before 3:07 p.m. on December 23, 1998, Gella was picked up in the police cell block by Honolulu Police Department (HPD) Detective Theodore Coons, whom he had not met previously. Detective Coons escorted Gella to an interview room, reviewed Gella's booking information sheet to ensure that the information was correct, and asked Gella if he wished to make a statement. Detective Coons then activated a tape recorder and began an interview.

Prior to discussing the incident of the previous day, Detective Coons posed the following questions to Gella:

Detective Coons: How do you feel right now?

Gella: Dizzy, a little bit dizzy.

Detective Coons: Do you feel well enough to make a statement to me?

Gella: Yeah.

Detective Coons: Do you want to wait—

Gella: No—

Detective Coons:—until later or do you want to do it now?

Gella: Yeah, (inaudible), yeah.

Detective Coons: Has anybody forced you, threatened you or coerced you in any way into making a statement to me?

Gella: No.

Detective Coons: Has anybody made any promises to you in return for a statement?

Gella: No.

Detective Coons: Is this statement that you're about to make, is it being made voluntarily and of your own free will?

Gella: Yeah, yes.

Detective Coons: This is your constitutional rights form. I'd like you to read along silently as I read and explain your rights to you. If you have any questions, stop me and I'll answer your questions. Do you have any questions right now?

Gella: No.

Detective Coons: Can you please read this line out loud so I know that—

Gella: Warning persons being [interrogated] of their constitutional rights.

Detective Coons: Darrell Gella, do you know that you're in the custody of Detective T. Coons at the main police station?

Gella: Yes.

Detective Coons: Please put your initials next to your answer. I'm going to ask you questions about Place to Keep which occurred on 12–22–98 in the City and County of Honolulu. But first I want to inform you of certain rights you have under the Constitution. Before I ask you any questions, you must understand your rights. You have a right to remain silent. You don't have to say anything to me or answer any of my questions. Anything you say may be used against you at your trial. You have a right to have an attorney present while I talk to you. If you cannot afford an attorney, the court will appoint one for you, prior to any questioning. If you decide to answer my questions without an attorney being present, you still have the right to stop answering at any[ ]time. Do you understand what I have told you?

Gella: Yes.

Detective Coons: Please put your initials next to your answer. Do you want an attorney now?

Gella: No.

. . . .

Detective Coons: Please put your initials next to your answer. And would you like to tell me what happened?

Gella: Yes.

Detective Coons proceeded to take a statement from Gella regarding the events of December 22, 1998. The interview concluded at approximately 3:30 p.m.

On January 4, 1999, a complaint was filed against Gella, charging him with two counts of attempted "unauthorized entry into motor vehicle," in violation of HRS §§ 705–500 (1993) [1] and 708–836.5 (Supp.1998),[2] one count of place to keep pistol or revolver, in violation of HRS § 134–6(c) (1993 & Supp. 1998),[3] and one count of possession of a firearm or ammunition by a person convicted of certain crimes, in violation of Hawai'i Revised Statutes (HRS) § 134–7 (1993 & Supp. 1998).[4]

On February 11, 1999, Gella filed a motion to suppress the foregoing tape-recorded statement. The prosecution filed a memorandum in opposition to the motion on February 19, 1998.[5] The circuit court heard Gella's motion on February 23, 1999.

At the hearing, Detective Coons testified as follows:

[ Deputy Prosecuting Attorney (DPA) ]: Now, at any time from the time you picked [Gella] up from down at the cell block until the time that the interview was terminated, did you make any threats to him regarding making a statement?

Detective Coons: No, I did not.

[DPA]: Did you make any promises to him as far as him making a statement?

---

1. HRS § 705–500 provides:
    **Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:
    (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
    (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
    (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
    (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

2. HRS § 708–836.5 provides in relevant part that "[a] person commits the offense of unauthorized entry into motor vehicle if the person intentionally or knowingly enters or remains unlawfully in a motor vehicle with the intent to commit a crime against a person or against property rights."

3. HRS § 134–6 provides in relevant part:
    (c) Except as provided in sections 134–5 and 134–9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station.
    . . . .
    (e). . . . Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. . . .

4. HRS § 134–7 provides in relevant part:
    (b) No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.
    . . . .
    (h) Any person violating subsection . . . (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony.

5. In its memorandum, the prosecution noted, *inter alia,* that Gella had been arrested for prior felonies.

Detective Coons: No, I did not.

[DPA]: Did he—at any time from the time you picked him up down the cell block until the end of the interview, did he, at any time, request to have an attorney present?

Detective Coons: No, he did not.

[DPA]: Or request to have the interview stopped?

Detective Coons: No, he did not.

[DPA]: And did you, in fact, ask him any questions ... prior to taking the statement from him about whether he had been coerced or threatened—

Detective Coons: Yes, I did. I asked him if he'd been coerced, threatened, forced, if it was voluntary. And he said that he wasn't coerced, threatened, forced. That it was voluntary.

On redirect examination, Detective Coons testified further:

[DPA]: Okay. When you say he looked pretty banged up, did his physical condition, in any way, appear to affect his thinking or his ability to give you a statement.

. . . .

Detective Coons: . . . . No. And when he told me that he was dizzy, I asked him if he felt he was well enough now. I asked him twice. And both times he said that he wanted to continue and make the statement.

[DPA]: And when he said he was dizzy, did he tell you he was a little bit dizzy?

Detective Coons: Yes.

[DPA] As far as him having used drugs the day before that, did you ask him if he had used anything within the past 24 hours?

Detective Coons: Yes.

[DPA]: And what was his response to that?

Detective Coons: No.

[DPA]: Did he indicate that he had taken some Tylenol?

Detective Coons: He told me that he was given some Tylenol at the hospital.

[DPA]: I guess when you were looking at him and when you were talking with him, did he have any problems communicating with you?

Detective Coons: No, none whatsoever.

Gella then testified as follows:

[Deputy Public Defender (DPD) ]: And when Detective Coons came to your cell, did he say anything to you?

Gella: Yes. He said his name was Detective Coons and he's here to ask me some questions.

[DPD]: Did—what did you say, if anything, back to him?

Gella: I told him I wanted to talk to my lawyer, Tim Rakieten.

. . . .

[DPD]: What did Detective Coons say to you, if anything?

Gella: He said that I wasn't going—he said that I wasn't going to be able to talk to you until I talk to him.

. . . .

[DPD]: And what do you remember what he said to you when you first got to the office?

Gella: I told him first that I want—I really think I needed to talk to my lawyer Tim Rakieten.

. . . .

[DPD]: Now, when the tape-recorder was turned on, he went through your constitutional rights with you, right?

Gella: Yes.

[DPD]: And one of the questions was he asked if you wanted an attorney now or if you wanted to speak to an attorney. Remember that?

Gella: Yeah.

[DPD]: You told him no, right?

Gella: Yeah.

[DPD]: Okay. Why didn't you tell him at that point in time when the tape-recorder was turned on that you wanted to talk to your lawyer?

Gella: 'Cause I was afraid and he just wanted everything to go smoothly. And I—I just was afraid.

[DPD]: What were you afraid of? What did you think might happen if you told him

then that you wanted to speak to your lawyer?

Gella: I was afraid that they'll take me downstairs, beat me up or something.

[DPD]: Now, did Detective Coons ever personally threaten to beat you up?

Gella: No, he didn't.

[DPD]: Okay. So what was that fear based on? Was it just based on what happened the day before?

Gella: Yeah.

[DPD]: And the fact that he wasn't letting you talk to your lawyer before—

Gella: Yeah. Got me scared when he never really cared about me being beaten up by the police.

. . . .

[DPD]: Were you still feeling the effects of the ice at the time you gave your statement . . . ?

Gella: Yes. I was dizzy.

[DPD]: Now, you also—were you in any pain from the injuries you suffered the day before?

Gella: Yes, my head hurt all over.

[DPD]: And can you describe how it hurt?

Gella: Made me—had hard time think. And I just want to go back to my cell already and lie down.

On cross-examination, Gella testified as follows:

[DPA]: Detective Theodore Coons who spoke to you on December 23rd, you said that he didn't threaten you or he wasn't threatening you in any way, right?

Gella: No.

[DPA]: In fact, I don't know if maybe polite is the right word but he was conversational with you like talking to you?

Gella: He was nice, I guess.

. . . .

[DPA]: So you weren't afraid of him? You didn't feel threatened by Detective Coons at all, correct?

Gella: Not at the time.

[DPA]: At any time you were with Detective Coons, you never felt threatened by him?

Gella: Well, when he never care about what I told him the police beat me up then I was kind of tripping out.

[DPA]: My question is though you indicated that you didn't feel threatened by Detective Coons? Wasn't that throughout the whole interview? At no time did he ever—did you ever feel threatened by him?

Gella: I felt threatened when he never really cared what happened to me.

. . . .

[DPA]: But he never acted in a threatening manner towards you, correct?

Gella: No, he never act in a threatening manner.

At the close of the evidentiary phase of the hearing, the DPD argued that, although Gella had understood his rights and the questions presented to him by Detective Coons, Gella had felt coerced into making a statement because (1) he had been beaten by police officers the day before giving his statement to Detective Coons and was in fear that the police might beat him again if he refused, (2) he was dizzy and had a headache at the time he gave his statement, (3) he had not slept for four days as of the day of his arrest, (4) he was still feeling the effects of "ice" at the time he gave his statement, and (5) he was unable to speak to his lawyer as he had requested. The circuit court responded as follows:

Before I rule, let me say that I found Detective Coons to be credible. That's not the problem. The Court adopts the—except for that business about Detective Coons refusing access to counsel, the Court otherwise adopts the analysis just made by [the DPD] that this is a totality of the circumstances.

Court, in particular, in viewing this mug shot[6] . . ., and admittedly as a lay person, infers that these abrasions were not just from being tackled. You know folks, that, in and of itself, should be enough to suppress this motion. But I think I have a

---

6. Gella's mug shot, which was introduced as an exhibit at the hearing, revealed bruises on the right side of Gella's face and bruises and a large cut on the side of his left eye. RA at 79.

little more than that and I do have the totality of the circumstances to find and I find them.

And let me say it is not just a crepes [sic] kind of measuring. I think the detective did do good faith exploration of whether Mr. Gella could communicate. He problem [sic] could communicate. He was probably also extremely scared with good reason to be scared.

■ The circuit court and the DPA then engaged in the following colloquy:

[DPA]: Your Honor, I would ask this Court to further this motion before ruling if the Court bases part of its ruling on what occurred prior to the statement. I would ask to be allowed to proffer evidence—

THE COURT: And I do base it on that.

[DPA]:—of the arresting officers . . . .

. . . . And if the court is basing part of its ruling on [what occurred when Gella was resisting arrest], then I would [be] asking to be allowed to rebut that.

THE COURT: I am basing part of my ruling on it. But I think the bottom line is that I'm not basing it exclusively on that.

Shortly thereafter, the circuit court orally granted Gella's motion to suppress his statement.[7]

On February 26, 1999, the prosecution filed a motion to reconsider the circuit court's oral order granting Gella's motion to suppress. The circuit court heard the prosecution's motion on March 5, 1999. At the hearing, the circuit court made the following pertinent observations:

I . . . let me make two specific things clear. Okay. With all due respect to Mr. Gella, I do not find credible that he asked for an attorney and that was ignored. In fact, I found the detective to be a very credible witness.

I do not believe that anything raised today is "new" and that's the basis of my denying the reconsideration and also to deny the allowing further hearing on this.

On March 19, 1999, the circuit court entered a written order denying the prosecution's motion for reconsideration.

Also on March 19, 1999, the circuit court adopted and filed its written findings and order granting Gella's motion to suppress. In that connection, the circuit court entered the following relevant findings of fact (FOFs):

---

7. Gella's statement to Detective Coons was not introduced into evidence at the hearing. Although both Gella's transcribed statement and his signed "Warning Persons Being Interrogated Of Their Constitutional Rights" form were offered as exhibits, the circuit court instead took judicial notice of the two documents. This court has recently cited the following proposition:

> A distinction must be carefully drawn between taking judicial notice of the *existence* of documents in the Court file as opposed to the *truth* of the facts asserted in those documents . . .
> . . . [W]hile a Court may take judicial notice of each document in the Court's file[,] it may only take judicial notice of the truth of facts asserted in documents such as orders, judgments and findings of fact and conclusions of law because of the principles of collateral estoppel, res judicata, and the law of the case.
> . . . . *In re Snider Farms, Inc.,* 83 B.R. 977, 986 (Bkrtcy.N.D.Ind.1988). See[ ] also[ ] . . . *United States v. Am. Tel. & Tel. Co.,* 83 F.R.D. 323 (D.D.C.1979) (judicial notice of court records should be limited to the fact of their existence rather than the truth of the matters contained in the court records) . . . .

*State v. Kotis,* 91 Hawai'i 319, 342, 984 P.2d 78, 101 (1999) (quoting *Gottsch v. Bank of Stapleton,* 235 Neb. 816, 458 N.W.2d 443, 455–56 (1990)) (emphases in original) (brackets in original) (some ellipsis points added and some in original). Accordingly, insofar as the circuit court intended to rely on the two documents for the truth of the assertions contained therein, they were not proper subjects of judicial notice. *See generally Kotis,* 91 Hawai'i at 343, 984 P.2d at 102. However, inasmuch as neither party raises this issue on appeal, we need not address it.

Neither party offered the tape recording of Gella's statement into evidence. Although not directly relevant to the current appeal, we take this opportunity to reemphasize that "having an electronic recording of all custodial interrogations would undoubtedly assist the trier of fact in ascertaining the truth." *State v. Kekona,* 77 Hawai'i 403, 408–09, 886 P.2d 740, 745–46 (1994). Moreover, the inclusion of such an electronic recording in the record would obviously facilitate this court's *de novo* review of "the ultimate issue of the voluntariness of a confession." *See State v. Hoey,* 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994).

4. The Court[,] in viewing a photo of [Gella's] facial injuries[,] finds that the injuries are consistent with being caused by the use of force. The Court makes no finding as to whether the police used excessive force.

. . . .

6. That[,] prior to being arrested[, Gella] had not slept for four days and had been up smoking methamphetamine.

7. That[,] at the time [Gella] gave his taped statement[,] he had informed Detective Coons that he felt dizzy and was in some pain from the injuries he had received.

8. That[,] because the police had used force to arrest [Gella] that resulted in injury, [Gella] felt compelled to give a statement to Detective Coons.

9. The Court finds that Detective Coons was a credible witness, that he treated [Gella] with proper respect, and that he did explain to [Gella] his constitutional rights with the assistance of a written constitutional rights form.

10. The Court finds[,] based on the totality of the circumstances[,] that [Gella's] statements to Detective Theodore Coons on December 23, 1998 were made involuntarily, and therefore must be suppressed and precluded from use at trial.

The prosecution filed a timely notice of appeal on April 15, 1999.

## II. *STANDARD OF REVIEW*

■ "[W]e apply a *de novo* standard of appellate review to the ultimate issue of the voluntariness of a confession." *State v. Hoey,* 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994) (internal quotation and brackets omitted). We thus "examine the entire record and make an independent determination of the ultimate issue of voluntariness based upon that review and the totality of the circumstances surrounding [the defendant's] statement." *Id.* (quoting *State v. Kelekolio,* 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (citations and internal quotation marks omitted) (brackets in original and emphasis added)).

*In re John Doe, Born on November 23, 1978,* 90 Hawai'i 246, 251, 978 P.2d 684, 689 (1999) (brackets in original). "However, 'it is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trial judge.'" *State v. Buch,* 83 Hawai'i 308, 321, 926 P.2d 599, 612 (1996) (quoting *Domingo v. State,* 76 Hawai'i 237, 242, 873 P.2d 775, 780 (1994) (citation and internal quotation marks omitted)).

■ Moreover,

"[O]ur review of whether [a defendant's] statement was in fact coerced requires determination of whether the findings of the trial court are clearly erroneous." *State v. Villeza,* 72 Haw. 327, 331, 817 P.2d 1054, 1056 (1991). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *State v. Ganal,* 81 Hawai'i 358, 368, 917 P.2d 370, 380 (1996) (citations, internal quotation marks, and brackets omitted).

*Id.* (Some brackets added and some in original.)

## III. *DISCUSSION*

■ The prosecution argues that "[t]he motion court's findings and the credible evidence show the court clearly erred when it found [Gella's] statement to Detective [Coons] was involuntary." Inasmuch as the totality of the circumstances indicates that Gella's statement to Detective Coons was, in fact, voluntary, we agree.

Under the fifth amendment to the United States Constitution and article 1, section 10 of the Hawai'i Constitution, "[n]o person shall . . . be compelled in any criminal case to be a witness against" himself or herself. When a confession is obtained in violation of either of these provisions, the prosecution will not be permitted to use the confession to secure a defendant's criminal conviction. [ ]*Kelekolio,* 74 Haw. at 502, 849 P.2d [at] 69 . . . . In *Kelekolio,* we stated that:

[t]he constitutional right against self-incrimination prevents the prosecution's use of a defendant's extrajudicial admissions of guilt where such admissions are the product of coercion. The basic considerations that require exclusion of confessions obtained through coercion "are the inherent untrustworthiness of involuntary confessions, a desire that criminal proceedings be accusatorial rather than inquisitorial and a desire that the police not become law breakers in the process of achieving society's valid enforcement objectives." The burden is on the prosecution to show that the statement was voluntarily given and not the product of coercion.

*Id.* at 502, 849 P.2d at 69 (citations omitted).

*State v. Bowe,* 77 Hawai'i 51, 57, 881 P.2d 538, 544 (1994) (some brackets added and some in original).

■ "After a defendant has been adequately apprised of his *'Miranda'* rights, he 'may waive [effectuation of] these rights provided the waiver is made voluntarily, knowingly, and intelligently.'" *State v. Luton,* 83 Hawai'i 443, 454, 927 P.2d 844, 855 (1996) (quoting *State v. Kaahanui,* 69 Haw. 473, 478, 747 P.2d 1276, 1279 (1987) (citation omitted)) (brackets in orginal). "[W]e have recognized that one of the basic considerations underlying the exclusion of confessions obtained through coercion is the 'inherent untrustworthiness of involuntary confessions.'"[8] *Bowe,* 77 Hawai'i at 57, 881 P.2d at 544 (quoting *Kelekolio,* 74 Haw. at 502, 849 P.2d at 69). In the present matter, Gella does not dispute that he *knowingly* waived his constitutional rights after being apprised of them by Detective Coons. The question remains whether Gella did so *voluntarily.*

The conditions surrounding Gella's interrogation do not suggest that any impermissible tactics were employed by Detective Coons to coerce Gella into making a statement. Gella was interrogated for less than half an hour by a single detective. The interrogation took place at approximately 3:00 p.m. Preliminarily to making his statement, Gella expressly acknowledged that he was doing so voluntarily and that no one had threatened or coerced him into making the statement. Although expressly given the opportunity, Gella did not terminate the interview or ask for an attorney.[9] Moreover, Gella himself testified that Detective Coons did not act in a threatening manner toward him. In fact, Gella testified that Detective Coons was "nice." Finally, Gella was no neophyte to the criminal justice system: he had been arrested for prior felonies, and, thereby, "had more than passing familiarity with police procedure." *Luton,* 83 Hawai'i at 454, 927 P.2d at 855. Accordingly, it would seem that Gella's statement to Detective Coons was given voluntarily. *Cf. id.* (considering, *inter alia,* defendant's admission that he had not been threatened by interrogating officers, defendant's knowledge that he might terminate the interview at any time, and defendant's familiarity with interrogation proceedings in determining that defendant's statement to police was voluntarily given); *State v. Kekona,* 77 Hawai'i 403, 406, 886 P.2d 740, 743 (1994) (considering, *inter alia,* length of interrogation, time of day, number of detectives, and treatment of defendant during interrogation in determining that defendant's statement to police was voluntarily given).

■ Nonetheless, Gella now contends that he felt compelled to give a statement to Detective Coons because he feared that he would be beaten, felt dizzy and in pain, and had not slept for four days prior to his

---

8. This proposition is embodied in HRS § 621-26 (1993), which provides that "[n]o confession shall be received in evidence unless it is first made to appear to the judge before whom the case is being tried that the confession was in fact voluntarily made."

9. Although Gella claimed that he requested an attorney, Detective Coons testified that Gella made no such request. The circuit court chose

to believe Detective Coons's testimony in this regard. The credibility of witnesses falls within the purview of the fact-finder, *see Buch,* 83 Hawai'i at 321, 926 P.2d at 612.

Correlatively, we note that, in his answering brief, Gella does not include the lack of an attorney among his list enumerating the "totality of the circumstances" warranting a finding that the statement was not voluntary.

arrest.[10]  We examine each of these in turn to determine whether the "totality of the circumstances" indicates that Gella's confession was voluntarily given.

We accept the factual findings underlying a lower court's determination regarding the voluntariness of a confession unless they are clearly erroneous.  *See Buch,* 83 Hawai'i at 321, 926 P.2d at 612.  Here, the circuit court found that Gella's injuries were consistent with the use of force by the police.  Perceiving no clear error in this finding,[11] we accept it and turn our attention to the circuit court's legal conclusion that whether the use of force by the police on December 22, 1998 affected the voluntariness of Gella's statement on December 23, 1998.

" 'A display of force in effecting an arrest (where there is no improper official conduct which continues to subvert the will of the defendant) has been held not to affect a confession subsequently made.' "  *People v. Carter,* 56 Cal.2d 549, 15 Cal.Rptr. 645, 364 P.2d 477, 484 (1961) (quoting *People v. Burwell,* 44 Cal.2d 16, 279 P.2d 744 (1955)).  Nonetheless, the circuit court suggested that the use of excessive force by the police would have rendered Gella's statement *per se* involuntary.  The United States Court of Appeals for the Ninth Circuit, in determining whether such a *per se* approach should be limited to those confessions made "substantially concurrently with physical violence," engaged in the following analysis:

> This does not, of course, mean that only those confessions literally made during beatings are *per se* involuntary.  Such a rule would be grossly underinclusive as " '[e]ven the most brutal physical torture . . . usually produces a confession, not during the actual torture but afterwards through fear of repetition.' "  *Jackson v. State,* 209 Md. 390, 121 A.2d 242, 244 (Md. 1956) (citation omitted).  It would most certainly undermine one of the bedrock premises of our prohibition against coerced

confessions: " 'that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.' " *[Arizona v. ]Fulminante,* [499 U.S. 279] 111 S.Ct. [1246,] 1256 [113 L.Ed.2d 302] [ (1991) ] (quoting *Rogers v. Richmond,* 365 U.S. 534, 540–41, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961)).  But, *a rule that all confessions preceded by violence are incurable, irrespective of ameliorative circumstances, may be too rigid.*

*United States v. Jenkins,* 938 F.2d 934, 939 (9th Cir.1991) (emphasis added).

In the present matter, we perceive no connection between the December 22, 1998 use of force by the police and Gella's December 23, 1998 statement.  Over twenty hours elapsed between the two incidents.  Any force used against Gella subsequent to his arrest was, of course, wholly inappropriate.  There is no indication, however, that it was in any way directed at inducing Gella to make a statement.  It was supposedly effected by members of the police pursuing Gella on foot and had ceased by the time Gella was incarcerated.  Detective Coons did not participate in any use of force against Gella and, as noted above, did nothing inappropriate on his own to induce a statement.  None of the offending officers were present at the time Gella's statement was made or, so far as the record reveals, were likely to have any further contact with Gella.  Apart from telling Detective Coons that he had been struck by the police the day before, Gella expressed no further complaint to Detective Gella about the abuse allegedly inflicted on him earlier and, aside from a headache, did not appear to be suffering from or under the influence of it.

"It goes without saying that the police run a grave risk of having statements and other evidence ruled inadmissible whenever they abuse an accused in their custody."  *Burch v.*

---

10.  Gella also contends that he was still feeling the effects of "ice" at the time he gave his statement.  At the hearing on his motion to suppress, however, the only continued effect of "ice" to which Gella testified was his dizziness.

11.  Indeed, the prosecution concedes that "[Gella's] injuries appear consistent with the findings articulated by the motion court."  The prosecution does not contest the circuit court's FOFs, but merely its ultimate legal conclusion that Gella's statement was not voluntary.

*State,* 346 Md. 253, 696 A.2d 443, 451(Md.), *cert. denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997). In this case, however, considering the circumstances, we are convinced that nothing that may have occurred immediately subsequent to Gella's arrest in any way induced the statements made the next day to Detective Coons. *Cf. id.,* 696 A.2d at 450–51 (noting that there was no basis for defendant's alleged fear of retaliation should he not make a statement, because interviewing detective did not engage in abuse, abusing officers did not engage in force in an attempt to induce a statement, abusing officers were not present during the statement, and defendant did not complain of or appear to be suffering from abuse). There was no direct evidence and no basis for any inference that Gella feared a repetition of the earlier abuse or that he any had reason for such a fear.

Gella further contends that he felt dizzy and was in pain from his injuries at the time he gave his statement.[12] Gella's suggestion that his physical condition impaired his ability to waive his rights voluntarily finds little support in the record. Although he did apprise Detective Coons of his pain and dizziness, Gella expressly represented to Detective Coons that he felt well enough to testify. Detective Coons twice asked Gella whether he would like to postpone the statement until he felt less dizzy, to which Gella responded in the negative. There is no evidence in the transcribed statement that his pain or dizziness interfered with his ability to think. Accordingly, we cannot discern that Gella's dizziness and pain rendered his statement involuntary. *Cf. People v. Benyi,* 152 A.D.2d 864, 544 N.Y.S.2d 74, 75 (N.Y.App.Div.1989) (concluding that, although defendant had been drinking and complained of headaches, defendant's testimony was voluntary).

Finally, Gella raises the concern that he had not slept for four days prior to the arrest. Inasmuch as over twenty hours had elapsed between the time of the arrest and the time Gella gave his statement, there is a logical vacuum as to how his prior nights of sleeplessness are pertinent to his statement to Detective Coons. The record does not establish that Gella was deprived of sleep between the time of his arrest and the time he made his statement to Detective Coons. Again, there is no evidence in the record that a lack of sleep affected his ability to think—in fact, Gella did not testify that he had been affected by sleeplessness in any way. Accordingly, we are left with the definite and firm conviction that it would be a mistake to find that Gella's nights without sleep prior to his arrest affected the voluntariness of his statement to Detective Coons the next day.

 "The fact that [Gella] subsequently had second thoughts regarding his confession[ ] does not render [it] inadmissible." *Luton,* 83 Hawai'i at 457, 927 P.2d at 858. Considering the totality of the circumstances surrounding Gella's statement and the testimony at the suppression hearing, the circuit court erred in concluding that Gella's statement was not freely and voluntarily given.

## IV. *CONCLUSION*

Based on the foregoing analysis, we vacate the circuit court's order granting Gella's motion to suppress and remand the matter to the circuit court for further proceedings.

---

**12.** As noted previously, Gella's contention that he was suffering from the effects of "ice" is redundant, inasmuch as he testified that the sole effect of the "ice" was dizziness. Moreover, this court has cited the proposition that, "[w]hen a movant challenges the voluntariness of his confession alleging that he was under the influence of drugs, he must adduce testimony as to the nature of the drugs." *State v. Smith,* 59 Haw. 565, 570, 583 P.2d 347, 351 (1978) (quoting *Damrell v. State,* 170 Ind.App. 256, 352 N.E.2d 855 (1976)) (brackets in original), *overruled on other grounds by Kelekolio,* 74 Haw. at 519, 849 P.2d at 76. Aside from the mention of dizziness, Gella did not adduce any testimony establishing the nature of "ice" as relevant to the issue of the voluntariness of the confession.