63 P.3d 405

STATE of Hawai'i, Plaintiff–Appellee,

v.

Jesse Shane CARVALHO, aka Shane
Carvalho, Defendant–Appellant.

No. 24407.

Intermediate Court of Appeals of Hawai'i.

Nov. 7, 2002.

Certiorari Granted Dec. 10, 2002.

Stuart N. Fujioka, Honolulu, on the briefs, for defendant-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., LIM, and FOLEY, JJ.

Opinion of the Court by LIM, J.

Defendant–Appellant Jesse Shane Carvalho (Carvalho) appeals the June 14, 2001 judgment of the circuit court of the first circuit [1] that convicted him, upon a jury's verdict, of assault in the second degree. On appeal, Carvalho complains (1) that the court [2] erred in denying his motion to suppress the statement he made to the police; and (2) that the court's imposition of an extended, indeterminate term of imprisonment of ten years deprived him of constitutional due process, as interpreted by the United States Supreme Court in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Discerning no error, we affirm.

## I. Background.

On November 16, 2000, the State· charged Carvalho, via complaint, with one count of assault in the second degree, in violation of Hawaii Revised Statutes (HRS) § 707–711(1)(d) (1993).[3] The complaint alleged that on October 28, 2000, Carvalho intentionally or knowingly caused bodily injury to Daniel Arce (Arce) with a dangerous instrument. Assault in the second degree is a class C felony, HRS § 707–711(2) (1993), carrying, in the ordinary course, a maximum, indeterminate term of imprisonment of five years. HRS § 706–660(2) (1993).

On December 21, 2000, Carvalho filed a motion to suppress the statement he gave to the police while he was in their custody on November 11, 2000. Carvalho claimed that he did not effectively waive his constitutional rights to counsel and against self-incrimination before making his statement: "It is clear from the record that [Carvalho] wanted to speak with an attorney, but did not know how to assert his right." Carvalho based his motion upon the fifth [4] and sixth [5] amendments to the United States Constitution and article I, sections 10 [6] and 14 [7] of the Hawai'i Constitution.

1. The Honorable Karen S.S. Ahn presided over the jury trial and sentencing of Defendant Appellant Jesse Shane Carvalho (Carvalho).

2. The Honorable Reynaldo D. Graulty heard and denied Carvalho's motion to suppress.

3. Hawaii Revised Statutes (HRS) § 707–711(1)(d) (1993) provides that "[a] person commits the offense of assault in the second degree if:.... The person intentionally or knowingly causes bodily injury to another person with a dangerous instrument[.]"

4. The fifth amendment to the United States Constitution provides, in pertinent part, that "[n]o person ... shall be compelled in any Criminal Case to be a witness against himself[.]"

5. The sixth amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."

6. Article I, section 10 of the Hawai'i Constitution provides, in pertinent part, that "[n]o person shall ... be compelled in any criminal case to be a witness against oneself."

7. Article I, section 14 of the Hawai'i Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for the accused's defense."

A hearing on the motion was held on January 10, 2001, before the motions judge. There, the parties questioned the interviewing detective, George Martin (Detective Martin). The transcript of Detective Martin's interview of Carvalho was stipulated into evidence for the hearing. The interview began as follows:

Q This is Detective George Martin with the Honolulu Police Department, Criminal Investigation Division. Tho following is a tape recorded interview with Jason Carvalho (sic), taking place at HPD Cell Block, downtown Honolulu. Today's date is 11–11–2000, the time now is 5:17 [p.m.]. This is in regards to a Assault Second under report number 00411506. Party being interviewed is the suspect in this case, which occurred on 11–28–2000(sic). Could you please state your full and correct name?

A Jesse Carvalho.

. . . .

Q What's your age now?

A Twenty-five.

Q And your date of birth?

A 8–26–75.

. . . .

Q Did you graduate from high school?

A Yeah, GED.

Q GED. Did you go to college?

A No. Applied it for [ (sic) ] just the other day.

Q So you read, write and understand the English language?

A Yeah.

Q Have any problems understanding me?

A No.

Q Under a doctor's care for psychological problems or physical problems?

A No.

Q Taking any type of medication?

A No.

Q Any alcohol in the past twenty-four hours?

A No.

Q Any illegal narcotics in the past twenty-four hours?

A No.

Q Okay. You're not being forced to make a statement to me? Is anybody forcing you to make a statement to me?

A No.

Q Are you being tricked or coerced into making a statement?

A No.

Q Has anything been promised to you before making this statement?

A No.

Q Are you making this statement of your own free will?

A Hm . . . yeah.

Q Okay. Why don't I go over your rights under the Constitution, okay? You seen this form before?

A The Miranda rights? [8]

Q This is the Miranda rights.

A Yeah. How come they never tell me when they arrested me?

Q Did they ask you anything about the offense? I'm going to be asking you about the offense, okay. So if they question you, then they're going to ask (sic) you your rights.

A Yeah, yeah, they asked me a few questions.

Q Okay. Jesse Shane Carvalho, do you understand that you're in the custody of Detective George Martin at the Honolulu Police Station?

A Yeah.

Q Go ahead and initial yes [on Honolulu Police Department form HPD–81 [9]]. I'm going to ask you questions about

---

8. *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

9. "HPD form 81[is] used by police officers to inform individuals being subjected to a custodial interrogation that they have a constitutional right to refuse to answer any questions put to them, that they are entitled to have an attorney present during the interrogation, and that an attorney will be appointed by the court if they cannot afford one. The form 81 also informs those individuals that whatever they say can be used against them in further proceedings." *State v. Liulama*, 9 Haw.App. 447, 452, 845 P.2d 1194, 1198 (1992).

an Assault Second which occurred on 10–28–2000 at 91—that's 701 J Pohakupuna Road. But first I must inform you of certain rights you have under the Constitution. Before I ask you any questions, you must understand your rights. You have a right to remain silent. You don't have to say anything to me or answer any of my questions. Anything you say may be used against you at your trial. You have a right to an attorney present while I talk to you. If you cannot afford an attorney, the court will appoint one for you, prior to any questioning. If you decide to answer any of my questions without an attorney being present, you still have the right to stop answering at anytime. Do you understand what I've explained to you?

A Yes.

Q Do you want an attorney now?

A Right now?

Q Right now.

A You going get me an attorney right now?

Q If you say yes, I'm not going to ask you any more questions 'cause they don't have attorney's [ (sic) ] available right at this second.

A Then how come it says do you want an attorney right now?

Q Because that's—if you want an attorney now, I'm just not going to question you.

A And how long going take you for get me an attorney?

Q Like I said, I'm not going to get an attorney for you right now, I'm just not going to ask you questions—

A But I'm just asking, how long would it take to have an—

Q I have no idea. To tell you the truth, Jesse, I don't know how long it would take to get one.

A So that mean I could be sitting inside that cell for another thirty-six hours, something like that?

Q No. I'm going to do whatever paperwork I gotta do to finish up the case and then I'll let you know. I'll come down and either let you know I'm going to let you go or I'm going to charge you, one or the other.

A Do you want an attorney now ... no.

Q Okay. Would you like to tell me what happened that night?

A To a point, yes.

(Footnotes supplied.) Thereupon, Carvalho's attorney argued that "it should have been more apparent to [Detective Martin] that [Carvalho] wanted to speak with a lawyer before answering any questions."

The court orally concluded that "under the totality of circumstances, [Carvalho] knowingly[,] intelligently and voluntarily made his statements to Detective Martin." Accordingly, the court denied Carvalho's motion to suppress. Finding of fact 9 of the court's written findings of fact and conclusions of law denying Carvalho's motion found as follows:

9. [Carvalho] claimed that [he] wanted to speak with an attorney, but did not know how to assert his right. However, [Carvalho's] prior contact with the criminal justice system demonstrates that [he] is no neophyte to police interrogation procedures. *See State v. Kekona*, 77 Hawai'i 403, 886 P.2d 740 (1994), where the court, in determining that the defendant understood his constitutional rights and the waiver provisions, found significant the fact that the defendant had been similarly warned in past encounters with the police. The evidence established that [Carvalho] had been similarly warned of his *Miranda* rights on two separate occasions before meeting with [Detective] Martin in this case.

Carvalho's jury trial began on March 27, 2001.[10] For the prosecution, Arce testified that he had been involved in a four-year, live-

---

**10.** Before the start of his jury trial, Carvalho declined the trial judge's offer of a second voluntariness hearing on his November 11, 2000 statement to the police. HRS § 621–26 (1993) ("No confession shall be received in evidence unless it is first made to appear to *the judge before whom the case is being tried* that the confession was in fact voluntarily made." (Emphasis added.)).

in relationship with Regina Irebaria (Irebaria). Their relationship ended in early October 2000, because Arce suspected Irebaria of having an affair with Carvalho. "I—I—I—she wasn't coming home so I threw her—put her stuff outside of the house, and that Saturday or Sunday she came pick it up." After Irebaria left him and moved in with Carvalho, Arce telephoned Carvalho and Carvalho confirmed his suspicions. Arce told Carvalho, "you know what, brah, I respect you, thank you for telling me the truth."

On the evening of October 28, 2000, Arce and his brother, Ernest Arce (Ernest), and some friends and acquaintances were hanging out, talking story and drinking in the garage of Arce's Ewa Beach home. At one point during the evening, Arce and one of the friends, Alonzio Acosta (Acosta), and perhaps one other companion, Michael McNair (McNair), went to the Ewa Mart convenience store to buy beer, cigarettes and sugar. Inside the store, Arce saw Irebaria—"My heart wen' jump." Arce went up to Irebaria and said "hi" to her twice, but she would not acknowledge him, until she looked at him and said, "yeah, yeah, yeah, yeah." Arce left the store, and he and Acosta exchanged words about Irebaria with Irebaria's ride, Jeffrey James Benzon (Benzon). Seeing this, Irebaria started "shooting"—meaning yelling—at Arce, challenging him: "She stated to us let's take it at the park." Arce and Acosta decided, "we no need this," and left.

After leaving Ewa Mart, Arce and his companions returned to Arce's garage and continued their socializing. Later that evening, the men noticed a truck that several times drove in and backed out of the long driveway leading to Arce's residence, then drove in and stopped. Irebaria, along with Carvalho, Carvalho's brother and a third man, walked down the driveway towards Arce's house. Somewhere along the way, Irebaria and her cohort confronted Arce, who had approached to investigate. Irebaria went up to Arce and told him, "we got some unsolved business." Carvalho's brother queried, "this the fucking guy, what, this is the fucking guy?" Arce repeatedly told his interlocutors, "we no need this," and, "it's not worth it." Arce also warned Carvalho that he could go to jail if

the encounter escalated. In response, Carvalho "false cracked" Arce on his left cheek. According to McNair, Carvalho "[f]ull like push 'em one time and [Arce] look like oh, you like fight, and [Arce] wen' push 'em back and the other guy crack 'em and they started fighting."

Dazed, and in an attempt to avoid further blows, Arce grabbed Carvalho around the knees and held on. Carvalho repeatedly hit Arce on the head with a stone or brick-like object. Arce did not see the object in Carvalho's hand, but remembered, "all of a sudden I felt one constant pain, I know wasn't his fist. One constant pain in the back of my head." McNair testified that he saw Carvalho hit Arce in the head with a stone "about seven or eight times" while Arce was "on the ground .... holding [Carvalho's] legs." Acosta testified that he saw Carvalho hit Arce over the head with a brick, "maybe about—maybe over maybe ten [times], maybe more maybe[,]" while Arce was "folded on the ground already[.]" Ernest testified that he saw Carvalho hit Arce on the head three times with a brick or rock while Arce was "down ... holding [Carvalho's] waist."

Simultaneously, Irebaria attacked Arce, kicking him in "the balls" and punching him in the ribs and the chest. Ernest got Irebaria off of Arce by poking her in the ribs, whereupon Carvalho's brother and the third man chased Ernest into the garage. Throughout the fracas, Arce kept beseeching for someone to call the police. Arce finally got free and ran into the garage. The imbroglio ended shortly thereafter, with Carvalho's brother and the third man calling Arce "you rat" for seeking help from the police.

Arce suffered a concussion, lacerations to the back part of his head, and "multiple abrasions, avulsions, complaints of pain and some tenderness to different parts of his body," as a result of the altercation. With Ernest's help, the police recovered a concrete "rock" from the Arce driveway—according to Ernest, "one good size rock"—that appeared to have a blood-like substance on it. The substance was later tested and found to be human blood.

In his defense, Carvalho presented two witnesses. His first witness, Benzon, testified exclusively about the encounter at the Ewa Mart. He remembered that after they drove away from the Ewa Mart, he dropped Irebaria off and went home. Benzon maintained that he was not at the Arce residence that night and knew nothing about the incident.

Carvalho's second witness, Irebaria, confirmed that she and Arce had a yelling match at the Ewa Mart on the night in question. She also testified that she went to Arce's house later that evening to talk to him about his apparent refusal to accept the demise of their relationship. "Because I needed to talk to him one on one. That's the only way things actually work where no one is around." Carvalho followed Irebaria to the Arce residence. "He came 'cause he was worried." As Irebaria and Carvalho walked down the Arce driveway, they came upon Arce, who was holding a beer bottle and gesticulating—taunting and testing them. A fight between Carvalho and Arce ensued, but Irebaria claimed she could not make out what was happening because of the cloud of dirt the combatants raised. Irebaria admitted jumping into the fight a little while later, repeatedly punching Arce until Ernest hit her and she fell to the ground. Irebaria maintained that Carvalho did not hit Arce in the head with an object during the fight. She did not see any blood on Arce that night. She allowed, however, that she did not see Arce hit Carvalho during the fight.

Carvalho chose not to testify in his defense. However, his November 11, 2000 statement to Detective Martin had been admitted into evidence by the State via transcript and audiotape, which was played for the jury. In his statement, Carvalho admitted he went to Arce's house on the night of October 28, 2000 with Irebaria and a number of other people, including his brother and one of his brother's friends, but maintained that he never got out of the truck and was not involved in the altercation. He did not see any part of it, because the truck was parked behind another vehicle. He heard about the incident only later, from his brother.

During his closing argument, Carvalho's attorney told the jury, "We're not denying that Jesse Carvalho fought with Daniel Arce on October 28, year 2000, . . . . Jesse was not truthful when he interviewed with the police." Defense counsel instead presented various alternative theories of acquittal or mitigation.[11] In arguing for acquittal, defense counsel asserted that Arce was the aggressor, and that Carvalho had therefore acted in self-defense. In aid of mitigation, defense counsel suggested that Carvalho did not wield the rock, or that someone other than Carvalho hit Arce with the rock. Defense counsel also urged the jury to question whether the rock could be considered a dangerous instrument. And defense counsel pointed to McNair's testimony in arguing that Carvalho and Arce fought only after mutually consenting to fight.

On March 30, 2001, at 11:17 a.m., the jury retired to its deliberations. That afternoon, at about 1:00 p.m., the jury informed the court that it had reached a verdict. The jury found Carvalho guilty as charged.

On April 26, 2001, the State filed a motion to sentence Carvalho to an extended term of imprisonment, pursuant to HRS § 706–661 (Supp.2001)[12] and HRS § 706–662 (1993 &

---

11. In addition to instructions on the charge of assault in the second degree, a class C felony, the court instructed the jury on the included misdemeanor, assault in the third degree, HRS § 707–712(1)(a) (1993) § "A person commits the offense of assault in the third degree if the person: . . . . Intentionally, knowingly, or recklessly causes bodily injury to another person[.]"), and on the included petty misdemeanor, assault in the third degree "committed in a fight or scuffle entered into by mutual consent[.]" HRS § 707–712(2) (1993). The court also instructed the jury on the law of self-defense.

12. HRS § 706–661 (Supp.2001) provides, in pertinent part:

In the cases designated in section 706–662, a person who has been convicted of a felony may be sentenced to an extended indeterminate term of imprisonment. When ordering such a sentence, the court shall impose the maximum length of imprisonment which shall be as follows:

. . . .

(4) For a class C felony—indeterminate ten-year term of imprisonment.

Supp.2001).[13] The State alleged that "Jesse Shane Carvalho is a 'persistent offender' and a 'multiple offender' whose commitment for an extended term is necessary for the protection of the public[.]"

After a June 14, 2001 hearing, the court agreed with the State that Carvalho is a "persistent offender" and a "multiple offender" within the meaning of HRS § 706–662(1) and HRS § 706–662(4), respectively. The court based these findings upon Carvalho's two prior felony convictions—on May 13, 1996 for theft in the second degree and on April 21, 1997 for attempted assault in the first degree. The parties had stipulated into evidence "certified documents with respect to the prior Theft 2 and the prior Attempted Assault 1[.]" The court also agreed with the State that

> commitment for an extended term is necessary for the protection of the public based on the following facts:
>
> a. [Carvalho] was on parole [for the two prior felony convictions] when he committed the instant felony assault.
>
> b. [Carvalho] has an extensive criminal history that includes a prior assault with a knife [ (on his brother) ] resulting in serious bodily injury.
>
> c. [Carvalho's] criminality has continued despite his prior contacts with the criminal justice system.
>
> d. [Carvalho] has failed to benefit from prior intervention by the criminal justice system, including probation and parole.
>
> e. [Carvalho] has demonstrated a disregard for the rights of others and a poor attitude toward the law.

**13.** HRS § 706–662 (1993 & Supp.2001) provides, in relevant part:

A convicted defendant may be subject to an extended term of imprisonment under section 706–661, if the convicted defendant satisfies one or more of the following criteria:
(1) The defendant is a persistent offender whose imprisonment for an extended term is necessary for protection of the public. The court shall not make such a finding unless the defendant has previously been convicted of two felonies committed at different times when the defendant was eighteen years of age or older.

> f. [Carvalho] has demonstrated a pattern of assaultive conduct which indicates that he is likely to be a recidivist.
>
> g. Due to the seriousness of [Carvalho's] prior assault conviction and the seriousness of the instant assault, [Carvalho] poses a serious threat to the community and his long term incarceration is necessary for the protection of the public.

Accordingly, the court granted the motion and sentenced Carvalho to a ten-year, indeterminate term of imprisonment, subject to a mandatory minimum term of three years and four months as a repeat offender.[14] A final judgment was entered on June 14, 2001. Carvalho filed a timely notice of this appeal on July 11, 2001.

## II. Discussion.

### A. The Motion to Suppress.

Carvalho's first point of error on appeal is that the court erred in denying his motion to suppress the statement he made to Detective Martin on November 11, 2000. Carvalho's arguments here mirror those he made below in support of his motion to suppress. He avers:

> Carvalho was attempting to assert his right to counsel during the process of being advised of his rights. .... [Carvalho] clearly wanted an attorney, and as questioning was not ceased, he did not re-initiate any discussion.

Opening Brief at 10. Carvalho also contends, "The ruling infringes on [Carvalho's] rights to counsel conferred by Article I, § 14 of the State of Hawaii Constitution and Amendment VI to the U.S. Constitution." Opening Brief at 6.

. . . .

(4) The defendant is a multiple offender whose criminal actions were so extensive that a sentence of imprisonment for an extended term is necessary for protection of the public. The court shall not make such a finding unless:
(a) The defendant is being sentenced for two or more felonies or is already under sentence of imprisonment for felony[.]

**14.** *See* HRS § 706–606.5 (Supp.2001).

The Hawai'i Supreme Court has spoken to the appellate standard of review of such issues:

> When a motion to suppress evidence is heard, it is for the trial court as factfinder to assess credibility of witnesses, including defendants, and to resolve all questions of fact. The court as trier of fact may draw all reasonable and legitimate inferences and deductions from the evidence adduced, and findings of the trial court will not be disturbed unless clearly erroneous. Whether the defendant invoked his right to counsel and whether he waived the right are primarily questions of fact. Thus, we would not disturb the trial court's determination of these questions unless, after a review of the whole record, we are left with the definite and firm conviction that a mistake has been committed.[15]

*State v. Nelson,* 69 Haw. 461, 468–69, 748 P.2d 365, 370 (1987) (brackets, ellipsis, citations and internal quotation marks omitted; footnote supplied). *See also State v. Villeza,* 72 Haw. 327, 331, 817 P.2d 1054, 1056 (1991) ("our review of whether Villeza's statement was in fact coerced requires determination of whether the findings of the trial court are clearly erroneous"); *State v. Hoey,* 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994); *State v. Kekona,* 77 Hawai'i 403, 405–6, 886 P.2d 740, 743 (1994); *State v. Luton,* 83 Hawai'i 443, 454, 927 P.2d 844, 855 (1996); *State v. Gella,* 92 Hawai'i 135, 142, 988 P.2d 200, 207 (1999). But further:

**15.** *Cf. State v. Edwards,* 96 Hawai'i 224, 231, 30 P.3d 238, 245 (2001) ("factual determinations made by the trial court deciding pretrial motions in a criminal case is [(sic)] governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made" (citation and internal block quote format omitted)).

**16.** On appeal, Carvalho does not challenge any of the court's written findings of fact and conclusions of law denying his motion to suppress, other than finding of fact 9. "On appeal, Amfac has not challenged this COL and therefore we treat it as binding on this court. *See* Hawaii Rules of Appellate Procedure (HRAP) Rule 28(b)(4)(C) (1984); *cf.* Leibert v. Finance Factors, Ltd., 71 Haw. 285, 288, 788 P.2d 833, 835

We stated earlier that waiver was primarily a question of fact. But in a more technical sense, waiver is a question that requires application of constitutional principles to the facts as found[.]

*Nelson,* 69 Haw. at 471 n. 9, 748 P.2d at 371 n. 9 (ellipsis, citation and internal quotation marks omitted). *See also Villeza,* 72 Haw. at 331, 817 P.2d at 1056; *Hoey,* 77 Hawai'i at 32, 881 P.2d at 519. Hence, we are required to

> examine the entire record and make an independent determination of the ultimate issue of voluntariness based upon that review and the totality of circumstances surrounding the defendant's statement. Thus, we apply a *de novo* standard of appellate review to the ultimate issue of the voluntariness of a confession.

*Hoey,* 77 Hawai'i at 32, 881 P.2d at 519 (brackets, emphases, citations and internal quotation marks omitted). *See also Villeza,* 72 Haw. at 331, 817 P.2d at 1056; *Kekona,* 77 Hawai'i at 406, 886 P.2d at 743; *Luton,* 83 Hawai'i at 452, 927 P.2d at 853; *Gella,* 92 Hawai'i at 142, 988 P.2d at 207.

On the question of waiver, Carvalho first argues, briefly, that the court erred in considering his previous law enforcement contacts legitimate evidence of a knowing, intelligent and voluntary waiver of his *Miranda* rights. In this connection, Carvalho challenges the court's finding of fact 9.[16]

(1990)." *Amfac, Inc. v. Waikiki Beachcomber Investment Co.,* 74 Haw. 85, 125, 839 P.2d 10, 31 (1992). "Alleged error in findings of fact not expressly challenged on appeal will be disregarded in the absence of plain error. *See* [HRAP Rule] 28(b)(4)(C)." *Id.* at 135, 839 P.2d at 35. The court's written findings of fact included finding of fact 8: "The Court finds that [Carvalho] knowingly, voluntarily and intelligently elected to waive [his *Miranda*] rights and give a statement." And finding of fact 10: "The Court finds that [Carvalho's] statement was in fact voluntary." The court's written conclusions of law included conclusion of law 4: "There is no evidence to indicate that [Carvalho] was coerced or tricked into making a statement, nor that he did not understand the consequences of his statement. Moreover, [Carvalho's] own words confirm that his statement was voluntary." And conclusion of law 5, that concluded, in pertinent part: "Viewing the totality of the circumstances in which [Carvalho's] statement was made it is

■ Contrary to Carvalho's assertion, it is a well-pedigreed principle that a trial court deciding a motion to suppress statements made during custodial interrogation may consider the defendant's previous law enforcement contacts in determining whether the defendant knowingly, intelligently and voluntarily waived his or her constitutional rights. *Gella*, 92 Hawai'i at 143, 988 P.2d at 208 (in holding that Gella's statement to a detective was voluntary, finding it significant that "Gella was no neophyte to the criminal justice system . . . and, thereby, had more than passing familiarity with police procedure" (citation and internal quotation marks omitted)); *Luton*, 83 Hawai'i at 452–54, 927 P.2d at 853–55 (Luton's prior felony arrest was relevant in determining whether he had been apprised of his fifth amendment rights and whether he had knowingly, intelligently and voluntarily waived those rights); *Kekona*, 77 Hawai'i at 406, 886 P.2d at 743 (affirming the trial court's conclusion that Kekona understood his *Miranda* rights, that was based, in part, upon Kekona's past encounters with the police and his invocation of those rights on at least one occasion). Carvalho seeks to distinguish the *Kekona* line of cases, thus: "The *Kekona* suspect was attempting to invoke his rights against self-incrimination after signing a written waiver. Carvalho was attempting to assert his right to counsel during the process of being advised of his rights." Opening Brief at 10. Under the *Kekona* line of cases, however, these are distinctions without a difference.

Carvalho also maintains, again quite summarily, that "[i]t is clear from the record that [Carvalho] wanted to speak with an attorney, but did not know how to assert his right." Opening Brief at 2. Here, as he did below in his motion to suppress, Carvalho erroneously invokes the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution. Carvalho had no sixth amendment or article I, section 14 right to counsel at the time of his November 11, 2000 interview with Detective Martin, because he was not formally charged until November 16, 2000:

clear that [Carvalho's] statement was freely and

An individual has a right to counsel under the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i State Constitution which guarantees an accused the right to assistance of counsel for his or her defense. However, this right attaches at critical stages of the criminal prosecution, only at or after the initiation of adversarial judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment.

*Luton*, 83 Hawai'i at 448, 927 P.2d at 849 (brackets, footnotes, citations and internal quotation marks omitted). It is the fifth amendment to the United States Constitution and article I, section 10 of the Hawai'i Constitution that protected Carvalho during his arrest:

Under the fifth amendment to the United States Constitution and article 1, section 10 of the Hawai'i Constitution, no person shall be compelled in any criminal case to be a witness against himself or herself. When a confession or inculpatory statement is obtained in violation of either of these provisions, the prosecution will not be permitted to use it to secure a defendant's criminal conviction.

The privilege against self-incrimination is fundamental to our system of constitutional rule. Inasmuch as the privilege is jeopardized when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and subjected to questioning, procedural safeguards must be employed to protect the privilege whenever interrogation in a custodial setting occurs.

*Miranda* imposed upon the prosecution the burden of demonstrating in any given case that these procedural safeguards had been employed and described them in relevant part as follows: Prior to any custodial questioning, the defendant must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided

voluntarily given. *Miranda*."

the waiver is made voluntarily, knowingly, and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

We noted in *Nelson* that the protections which the United States Supreme Court enumerated in *Miranda* have an independent source in the Hawai'i Constitution's privilege against self-incrimination. In determining the admissibility of custodial statements, the prosecutor must show that each accused was warned that he had a right to remain silent, that anything said could be used against him, that he had a right to the presence of an attorney, and that if he could not afford an attorney one would be appointed for him. If these minimal safeguards are not satisfied, then statements made by the accused may not be used either as direct evidence or to impeach the defendant's credibility.

Assuming, however, that the minimal safeguards are observed, the accused may waive the right to counsel, provided that such waiver is voluntarily and intelligently undertaken. Nevertheless, we emphasize that waiver of the right to counsel during police interrogation is not irrevocable; in accordance with the mandate of *Miranda*, the right to counsel may be invoked at any point, and when invoked, all substantive questioning must cease unless and until counsel is provided.

*Hoey,* 77 Hawai'i at 32–33, 881 P.2d at 519–20 (brackets, ellipses, citations and internal quotation marks and block quote format omitted).

Here, as in *Luton,* it is important to keep in mind the distinction between the two constitutional fonts, lest Carvalho undeservedly "prevail by combining the two of them." *Luton,* 83 Hawai'i at 451, 927 P.2d at 852 (citation and internal quotation marks omitted) (Luton argued that he had a sixth amend-

ment right to counsel during a custodial interrogation which took place before he was formally charged because, unbeknownst to the police, he had been represented by counsel at a previous judicial determination of probable cause hearing). Accordingly, the proper inquiry

> requires a twofold analysis: (1) whether [the defendant] was informed of his fifth amendment rights within the context of custodial interrogations; and, if so, (2) whether he invoked or waived these rights.

*Id.* at 452, 927 P.2d at 853.

As to both prongs of the analysis, we again observe that Carvalho had been given *Miranda* warnings during his two previous encounters with the police. Moreover, the colloquy between Detective Martin and Carvalho at the beginning of the interview reveals Carvalho's easy familiarity with the warnings. It was Carvalho, not Detective Martin, who first mentioned the *Miranda* warnings by name.

As to the first prong of the analysis, Carvalho does not dispute that he was properly informed of his *Miranda* rights. Carvalho hangs his appeal on the second prong of the analysis. In this connection, Carvalho cites only one legal authority. Carvalho relies on *State v. Mailo,* 69 Haw. 51, 731 P.2d 1264 (1987), to support his assertion that he invoked his *Miranda* right to counsel during custodial interrogation. In *Mailo,* the following colloquy occurred after the interviewing police officer informed Mailo of his *Miranda* rights:

> Q. You want a lawyer here while I talk to you?
>
> A. Yeah.
>
> Q. You want a lawyer now? ... while I talk to you or don't you want a lawyer?
>
> A. Nah, 'as all right.
>
> Q. You don't want one?
>
> A. Uh.
>
> Q. Okay....

*Id.* at 52, 731 P.2d at 1266 (emphases omitted). On appeal, the supreme court noted that the police officer admitted he "clearly understood [Mailo's] response as affirmative

when asked if he desired an attorney." *Id.* at 53, 731 P.2d at 1266. Thereupon, the supreme court held that the trial court clearly erred in determining that Mailo's initial answer was ambiguous. In concluding, accordingly, that Mailo's statement to the police should have been suppressed, the supreme court reiterated the "bright line rule that once the right to counsel has been invoked all questioning must cease." *Id.* (citations omitted).

Carvalho's purported invocation of his right to counsel during custodial interrogation is, however, more appropriately characterized as ambiguous in nature, hence governed by the supreme court's decision in *Hoey, supra.* In *Hoey,* the interviewing detective administered *Miranda* warnings to Hoey, then the following colloquy transpired:

Q. .... You think you'll need an attorney now?

A. .... I don't have the money to buy one.

Q. No, well, I'm just saying do you think you'll need an attorney?

A. Right now, I don't think so.

Q. Okay. If you decide to answer my questions without an attorney being present, you still have the right to stop answering at any time.... In other words, if you don't want to answer a question, you don't have to. Do you understand what I've told you?

A. Yes.

Q. Okay. I'll go over would you like to tell me what happened, but for now this is what I need for you to do. Initial where it says "yes" here on the HPD Form 81. You know why you're being arrested?

A. Yes.

Q. Okay. Here it says, "Do you want an attorney now?" The answer was "no." Is that correct?

A. Yes.

*Hoey,* 77 Hawai'i at 22, 881 P.2d at 509 (brackets and emphases omitted). In holding that the trial court erred in admitting Hoey's statement, the supreme court stated, "We begin with the proposition that if a defendant makes an *unequivocal* request for counsel while being "Mirandized," all questioning must terminate until counsel is present." *Id.* at 34, 881 P.2d at 521 (citation omitted; emphasis in the original). However, the supreme court distinguished Hoey's equivocal or ambiguous invocation of his right to counsel, from the unequivocal request for counsel in *Mailo* that *ipse dixit* immediately triggered the ban on further custodial questioning. *Id.* at 34, 881 P.2d at 521. Upon that distinction, the supreme court held that

(1) when a suspect makes an ambiguous or equivocal request for counsel during custodial interrogation, the police must either cease all questioning or seek non-substantive clarification of the suspect's request, and (2) if, upon clarification, the defendant unambiguously and unequivocally invokes the right to counsel, all substantive questioning must cease until counsel is present. Conversely, we hold that if, upon clarification, the defendant voluntarily, knowingly, and intelligently waives the presence of counsel, substantive questioning may continue.

*Id.* at 36, 881 P.2d at 523.

■ Here, Carvalho's initial questions about whether an attorney would be obtained "[r]ight now" did not constitute an unequivocal and unambiguous invocation of his right to counsel during custodial interrogation, such that *Mailo* would mandate an immediate cessation of all further questioning. Carvalho's following questions made it clear that what he was concerned about was the precise moment an attorney could be made available to him. Detective Martin attempted to answer all of Carvalho's questions, and Carvalho does not now contend and did not argue below that Detective Martin misled him in any way. Most important, Detective Martin made it clear to Carvalho several times that if he requested an attorney, further police interrogation would cease, no matter when the attorney would ultimately arrive. Apparently satisfied with Detective Martin's responses, Carvalho unequivocally and unambiguously stated that he did not want an attorney "now." Hence, unlike the detective in *Hoey,* Detective Martin satisfied the clarification requirement set forth in *Hoey,* with-

out misleading Carvalho in any material respect.

Carvalho does not argue that his colloquy with Detective Martin left him with the belief that he was entitled to an attorney only at some future time and not during the interview. But even if Carvalho did so argue, the argument would be unavailing.

In *Duckworth v. Eagan*, 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989), the United States Supreme Court confronted *Miranda* warnings which included, in addition to the required warnings, the proviso, "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court." *Id.* at 198, 109 S.Ct. 2875 (emphasis omitted). Disagreeing with a majority of the United States Court of Appeals for the Seventh Circuit, who concluded that the suspect "arguably believed that he could not secure a lawyer during interrogation" as a result of this proviso, *id.* at 200, 109 S.Ct. 2875 (internal quotation marks omitted), the Supreme Court held that

> *Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one. The Court in *Miranda* emphasized that it was not suggesting that each police station must have a "station house lawyer" present at all times to advise prisoners. If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel. Here, [the suspect] did just that.

*Id.* at 204, 109 S.Ct. 2875 (footnote, citations and some internal quotation marks omitted). Similarly, in *State v. Maluia*, 56 Haw. 428, 539 P.2d 1200 (1975), our supreme court had to contend with this argument by Maluia:

> The language in [HPD] Form 81 did not inform [Maluia] that if he was too poor to pay for a lawyer, one would be furnished him *before* questioning. To say that a lawyer will be appointed by the court without further explanation is the same as saying that the lawyer will be appointed at some unspecified time in the future and is

contradictory to the statement that he has a right to counsel now. This is not the effective and express explanation of the right to counsel required by the *Miranda* case.

*Id.* at 432, 539 P.2d at 1205 (ellipses, original brackets and internal quotation marks omitted; emphasis in the original). Disagreeing, the supreme court pointed out that Maluia was warned, thus: "You also have a right to have an attorney present while I talk to you. If you cannot afford an attorney, the court will appoint one for you." *Id.* (internal quotation marks omitted). The supreme court explained:

> The placing of the statement as to the right to appointed counsel immediately after the statement concerning the right to counsel at the interview, in itself indicated that [Maluia] had the right to appointed counsel at the interview.

*Id.* (citation omitted). The supreme court also noted:

> Moreover, the warning must be read in the light of the additional language: "If you decide to answer my questions without a lawyer being present, you still have the right to stop answering at anytime," which immediately followed. Thus [Maluia] was told that any decision he made to proceed was tentative, and he could stop the interview at any time.

*Id.* at 432–33, 539 P.2d at 1205 (citation omitted). The supreme court therefore held: "The argument that the form was defective in failing to explain *when* the court would appoint an attorney for [Maluia], is not supported by *Miranda*." *Id.* at 433, 539 P.2d at 1206 (emphasis in the original).

In this case, Detective Martin made it crystal clear to Carvalho, "in accordance with the mandate of *Miranda*, [that] the right to counsel may be invoked at any point, and when invoked, all substantive questioning must cease unless and until counsel is provided." *Hoey*, 77 Hawai'i at 33, 881 P.2d at 520 (citation omitted). Under the circumstances, that is all that *Miranda* and its progeny required. We therefore hold that the court did not err in denying Carvalho's motion to suppress.

■ Even if there was error, we believe there was no reasonable probability that the admission into evidence of Carvalho's statement contributed to his conviction, and that it was therefore harmless beyond a reasonable doubt. *See, e.g., State v. Amorin*, 61 Haw. 356, 363, 604 P.2d 45, 50 (1979) (judgment of conviction vacated because trial court's error in admitting Amorin's illegally obtained confession "raised the reasonable possibility of having contributed to the conviction below; we cannot say that it was harmless beyond a reasonable doubt").

Our belief is founded, first, upon the exculpatory nature of Carvalho's statement. Although Carvalho admitted in his statement that he was at the scene of the crime, he maintained that he did not get out of the truck. Too, defense counsel disavowed Carvalho's statement in favor of Irebaria's version of the incident, apparently in a strategic attempt to bolster Carvalho's arguments in favor of acquittal and mitigation. The disavowal wholly negated any effect of the statement, save perhaps some residual, self-induced taint on Carvalho's credibility, who, in any event did not testify. That taint was a

mere tinge, however, in light of the overwhelming nature of the State's evidence against Carvalho. In addition to Arce's testimony about being beaten by Carvalho, the State presented three eyewitnesses—McNair, Acosta and Ernest—who saw Carvalho repeatedly whacking a defenseless Arce over the head with a brick or rock or stone. And no witness testified at trial that Arce offered Carvalho a provocation sufficient to justify doing so.

### A. *Apprendi Error.*

■ For his second point of error on appeal, Carvalho contends the court committed plain error [17] in sentencing him to an extended term of imprisonment pursuant to HRS §§ 706–661 and 706–662. Carvalho argues that HRS § 706–662(1) and (4) contravene the due process provisions of article I, sections 5 [18] and 14,[19] of the Hawai'i Constitution and the fifth [20] and fourteenth [21] amendments to the United States Constitution.[22] Carvalho bases this argument on the United States Supreme Court's holding in *Apprendi, supra.* While Carvalho does not complain of

---

17. Carvalho did not raise an objection based upon *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), at his sentencing. "This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." *State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993) (citation omitted). "This court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Vanstory*, 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999) (brackets, citation and internal quotation marks omitted). Hawai'i Rules of Penal Procedure (HRPP) Rule 52(a) (2000) provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." HRPP Rule 52(b) (2000) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

18. Article I, section 5 of the Hawai'i Constitution provides, in relevant part, that "[n]o person shall be deprived of life, liberty of property without due process of law[.]"

19. Article I, section 14 of the Hawai'i Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury [and] to be informed of the nature and cause of the accusation[.]"

20. The fifth amendment to the United States Constitution provides, in relevant part, that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law[.]"

21. The fourteenth amendment to the United States Constitution provides, in pertinent part, that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law[.]"

22. *Apprendi, supra,* was also predicated upon the sixth amendment to the United States Constitution, *Apprendi*, 530 U.S. at 476–77, 120 S.Ct. 2348, which reads, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation[.]"

the trial judge's predicate findings regarding his two prior felony convictions (and for good reason, *infra* ), Carvalho maintains that *Apprendi* requires that *a jury* decide, beyond a reasonable doubt, whether an extended sentence "is necessary for protection of the public[,]" HRS § 706–662(1) & (4), and not *the judge,* as provided for in the governing subsections and as was the case here. Carvalho thus asserts that HRS § 706–662 is unconstitutional on its face.

■ Carvalho's *Apprendi* claim presents an issue of first impression in Hawai'i. "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case, and, thus, questions of constitutional law are reviewed on appeal under the 'right/wrong' standard." *State v. Aplaca,* 96 Hawai'i 17, 22, 25 P.3d 792, 797 (2001) (citation and some internal quotation marks omitted).

In *Apprendi,* the Supreme Court analyzed the constitutionality of a New Jersey "hate crime" law that allowed the imposition of a prison term longer than the maximum statutory term otherwise provided for certain offenses, based upon a finding, by the sentencing judge and by a preponderance of the evidence, that the crime was committed with biased purpose. *Apprendi,* 530 U.S. at 469–70, 120 S.Ct. 2348. The Supreme Court stated the pertinent issue and its constitutional underpinnings:

> The question whether Apprendi had a constitutional right to have a jury find such bias on the basis of proof beyond a reasonable doubt is starkly presented.
>
> Our answer to that question was foreshadowed by our opinion in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), construing a federal statute. We there noted that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.,* at 243, n. 6, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311. The Fourteenth Amendment commands the same

answer in this case involving a state statute.

. . . .

> At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury," Amdt. 6. Taken together, these rights indisputably entitle a criminal defendant to "a 'jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin,* 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995); see also *Sullivan v. Louisiana,* 508 U.S. 275, 278, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); *[In re] Winship,* 397 U.S. 358,] 364, 90 S.Ct. 1068[, 25 L.Ed.2d 368 (1970) ] ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").

*Id.* at 475–77, 120 S.Ct. 2348 (some brackets in the original; footnote omitted). Hence, the Supreme Court held that,

> [o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

*Id.* at 490, 120 S.Ct. 2348. Regarding the express exception for prior convictions, the Supreme Court explained that

> there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.

*Id.* at 496, 120 S.Ct. 2348.

In thus holding the New Jersey law unconstitutional, the Supreme Court emphasized that "the relevant inquiry is one not of form, but of effect—does the required finding *expose* the defendant to a greater punishment

than that authorized by the jury's guilty verdict?" *Id.* at 494, 120 S.Ct. 2348 (emphasis added). *See also Ring v. Arizona,* 536 U.S. 584, 586, 122 S.Ct. 2428, 2430, 153 L.Ed.2d 556 (2002) (*Apprendi* held that a defendant cannot be "*exposed* to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone" (brackets, ellipsis, original emphasis, citation and internal quotation marks omitted)). Conversely, the Supreme Court confirmed the continuing viability of the common law tradition that affords the sentencing judge discretion to sentence within the maximum range of punishment to which a defendant has properly been exposed:

> We should be clear that nothing in this [common law] history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute. We have often noted that judges in this country have long exercised discretion of this nature in imposing sentence *within statutory limits* in the individual case.

*Apprendi,* 530 U.S. at 481, 120 S.Ct. 2348 (emphases in the original).

Thus understood, *Apprendi* clearly does not support Carvalho's position in this appeal. Under HRS § 706–662(1) and 4, the sentencing judge first finds the facts relating to the defendant's prior felony convictions that place the defendant within the class of offenders subject to extended term sentencing, *State v. Loa,* 83 Hawai'i 335, 354, 926 P.2d 1258, 1277 (1996); *State v. Huelsman,* 60 Haw. 71, 76, 588 P.2d 394, 398 (1978), *overruled on other grounds, State v. Tafoya,* 91 Hawai'i 261, 271–72, 982 P.2d 890, 900–901 (1999), "the proof of which *exposes* the defendant to punishment by an extended term sentence, similarly to the manner in which the proof of his guilt *exposes* him to ordinary sentencing." *Huelsman,* 60 Haw. at 79, 588 P.2d at 400 (emphases supplied).

 Here, the sentencing judge found, upon certified documents stipulated into evidence by the parties, the predicate facts regarding Carvalho's two prior felony convictions. Under the express *Apprendi* ex-

ception for prior convictions, these predicate facts need not have been "submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348. By the same token, these predicate facts were the very facts that exposed Carvalho to the extended term sentences under HRS § 706–661. *Huelsman,* 60 Haw. at 79, 588 P.2d at 400. Hence, all *Apprendi* doubts disappeared once these predicate facts were properly found. *Id.* at 494, 120 S.Ct. 2348; *Ring,* 536 U.S. at 587–89, 122 S.Ct. at 2432. The sentencing court's further finding, that an extended prison term was "necessary for protection of the public[,]" HRS § 706–662(1) & (4), was a mere exercise of its ordinary and longstanding discretion to "impos[e] a judgment *within the range* prescribed by statute[,]" *Apprendi,* 530 U.S. at 481, 120 S.Ct. 2348 (emphasis in the original), and thus did not offend *Apprendi.*

The Court of Appeals of New York recently confronted the same issue under a similar statute. *People v. Rosen,* 96 N.Y.2d 329, 728 N.Y.S.2d 407, 752 N.E.2d 844 (2001), *cert. denied, Rosen v. New York,* 534 U.S. 899, 122 S.Ct. 224, 151 L.Ed.2d 160, 70 USLW 3240 (U.S.N.Y. Oct.01, 2001) (No. 01–5033). In *Rosen,* the defendant brought a plain error, *Apprendi* challenge against a New York law that allowed the sentencing court to impose an extended term of imprisonment if the defendant qualified as a "persistent felony offender." *Rosen,* 728 N.Y.S.2d 407, 752 N.E.2d at 846. The New York statute, like ours, required a two-step inquiry by the sentencing court: (1) whether the defendant is exposed to extended term sentencing based on two or more prior felony convictions; and (2) whether an extended term is appropriate based on the sentencing court's review of the defendant's history and character and the nature and circumstances of the crime. *Id.* at 847. The Court of Appeals held that because the prior felony convictions, *ipso facto* and alone, exposed the defendant to the extended term, no *Apprendi* error occurred. *Id.* Regarding the second prong of the inquiry, "the sentencing court is … only fulfilling its traditional role—giving due consideration to agreed-upon factors—in determining an

appropriate sentence within the permissible statutory range." Id.

All in all, we conclude that HRS § 706–662(1) and (4), facially and as applied in this case, do not raise the constitutional concerns confronted in *Apprendi*. Hence, the court did not err, plainly or otherwise, in sentencing Carvalho to an extended term of imprisonment. Because Carvalho relies in this point on appeal only on *Apprendi*, we do not fully examine similar concerns under the Hawai'i Constitution. However, because Carvalho cites provisions of the Hawai'i Constitution, albeit merely in passing and without argument, we cite *Tafoya*, *supra*, a pre-*Apprendi* Hawai'i Supreme Court case that interpreted the Hawai'i Constitution, but one which, like *Apprendi*, relied upon *Jones*, *supra:*

> The finding whether an extended term of imprisonment is necessary for the protection of the public, also necessary for imposition of an extended term of imprisonment pursuant to HRS § 706–662(5), is *not* a factual finding susceptible to jury determination. Therefore, this finding is within the province of the sentencing court pursuant to the rule explicated, *supra.*

*Tafoya*, 91 Hawai'i at 275 n. 19, 982 P.2d at 904 n. 19 (emphasis in the original).

### III. Conclusion.

The court's June 14, 2001 judgment is affirmed.